UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JOSEPH GONSOULIN                                    CIVIL ACTION

VERSUS                                             NO. 24-1005

BETA USA, INC., ET AL.                             SECTION "L"(4)

## ORDER & REASONS

Before the Court are three motions for summary judgment filed by Defendant Beta, USA

Inc. R. Docs. 83, 94, and 96. Defendant Zhejiang Apollo Sports Technology Co., Ltd. has also

filed a motion for summary judgment in its own right. R. Doc. 105. Plaintiff Joseph Gonsoulin

opposes the motions. R. Docs. 136, 137, 138, 139. Defendants replied. R. Docs. 146, 147, 148,

149. Oral argument was held on Wednesday, July 23, 2023 at 9:00 A.M. R. Doc. 157. After

considering the record, briefing, and applicable law, the Court now rules as follows.

I.      BACKGROUND

This products liability case arises out of injuries sustained by Plaintiff Joseph Gonsoulin

("Gonsoulin") while seated on an allegedly defective electronic motorcycle that unexpectedly took

off and caused him to crash into a wall. R. Doc. 18. On the morning of October 10, 2023, Gonsoulin

drove to his job at Champion Cycle Center in Covington, Louisiana where he worked as a

motorcycle salesman.[1] R. Doc. 140-21 at 11, 135. Upon arrival, he noticed a brand new Beta

Explorer Electric Motorcycle (the "Beta Explorer") in the store's showroom. *Id.* at 96. Gonsoulin's

co-worker, Madison Penton, had already walked two of the Beta Explorers outside of the store but

---

[1]      Gonsoulin is a self-proclaimed "experienced motorcycle rider" who claims to have ridden approximately
1,000 different motorcycles throughout his life. He has previously raced dirt bikes in motor cross leagues, winning
various trophies and plaques throughout his racing career, and even had a motorcycle endorsement on his driver's
license. *Id.* at 34-37, 46-47, 80, 106.

left one inside the dealership because she thought Gonsoulin would want to see it. R. Doc. 83-10 at ¶7, 11. Gonsoulin then asked Ms. Penton how the bike operated because she had apparently helped assemble it and rode one the day before in the store's parking lot. *Id.* at ¶ 3-5; R. Doc. 140-21 at 91; R. Doc. 140-22 at 73-74. Gonsoulin then mounted the bike while it was still inside the Champion showroom. R. Doc. 140-21 at 96, 114, 127-28. It is undisputed that he did not read the Beta Explorer's Owner's Manual (the "Manual") or put on any protective gear before getting on the bike. *Id.* at 92, 96. While Gonsoulin was sitting on the Beta Explorer, Ms. Penton began showing him how to cycle through the bike's different modes, such as "Turtle," "Rabbit," and "Rocket" and eventually placed the bike into "READY" status. R. Doc. 83-10 at ¶12-13; R. Doc. 140-21 at 91; R. Doc. 140-22 at 73-74. According to Ms. Penton, Gonsoulin then allegedly twisted the throttle, causing the bike to jump, and the two discussed the Beta Explorer's "torque" and "power." R. Doc. 83-10 at ¶13; R. Doc. 140-21 at 122 (Gonsoulin refuting Ms. Penton's statement that he intentionally turned the throttle at any time on the date of the accident).

After their conversation, Ms. Penton turned away and went to move a four-wheeler that was parked behind the Beta Explorer. R. Doc. 83-10 at ¶14; R. Doc. 140-22 at 146. Thereafter, Gonsoulin, who remained on the bike, alleges that he rested his right hand on the Beta Explorer's right handlebar where the throttle is located with no intention of riding the bike. R. Doc. 140-21 at 56. Gonsoulin then claims that the Beta Motorcycle suddenly entered "Rocket Mode," accelerated without warning, and popped a "wheelie." *Id.* at 58, 101. At that moment, Ms. Penton turned back and witnessed the accident in real time, noting that Gonsoulin was on balance but with his face down when he "went straight into the wall" approximately 25-30 feet ahead of him. R. Doc. 83-10 at ¶ 15; R. Doc. 83-7; R. Doc. 140-22 at 150-51. Gonsoulin states that he was unable to reach the brakes located on each handlebar due to the sudden force of the bike's acceleration and thus

was searching for a kill switch or foot lever brake to stop it—both of which the Beta Explorer does not have—during the one to two seconds before the collision. R. Doc. 140-21 at 58, 104-05. As a result of the accident, Gonsoulin sustained multiple facial fractures and permanent damage to his spinal cord, which ultimately rendered him quadriplegic. *Id.* at 158, 216.

On April 8, 2024, Gonsoulin filed the present action before this Court on the basis of diversity jurisdiction. R. Docs. 1, 18. He has sued both the manufacturer of the Beta Explorer—Defendant Zhejiang Apollo Sports Technology ("Apollo")—and the bike's American distributor—Defendant Beta USA, Inc. ("Beta USA").[2] *Id.* at 4-9. Gonsoulin asserts two causes of action under the Louisiana Products Liability Act, including failure to warn and defective design. *Id.* at 11-24; R. Doc. 157 (dismissing Gonsoulin's negligence and strict liability claims based on the exclusivity of the LPLA). In support of his claims, he contends that the Beta Explorer was defective insofar as its motor safety system catastrophically and unexpectedly failed and because the bike had an overly-sensitive throttle as well as lacked a "kill switch" and rear foot pedal brake, which allegedly could have prevented the accident and/or minimized his injuries. *Id.* Gonsoulin also argues that the Beta Explorer was deceptively advertised and failed to incorporate visible warnings related to the risk of the product's sudden acceleration with full throttle use. *Id.*

## II.    PRESENT MOTIONS

In the present motions, Defendants Beta USA and Apollo ("Defendants") move for dismissal on summary judgment of Gonsoulin's failure to warn and design defect claims for various reasons. First, Defendants argue that Gonsoulin's injuries from the motorcycle accident did not arise out of a "reasonably anticipated use" of the Beta Explorer, and thus, they cannot be held liable under the LPLA. R. Doc. 83. Second, Defendants contend that Gonsoulin's failure to

---

[2]    Apollo manufactures the Beta Explorer, which is then imported by Beta USA for distribution in the United States. *Id.* at 1, 10.

warn claim fails, *inter alia*, due to a lack of causation and the fact that the Beta Explorer's warnings were otherwise adequate. R. Doc. 94. Third, Defendants aver that Gonsoulin's design defect claim should be dismissed largely because he has failed to point to a specific alternative design or any expert testimony in support of adding the safety features at issue in this case. R. Doc. 96. In opposition, Gonsoulin maintains that there are genuine issues of material fact that preclude a finding of summary judgment as to his LPLA claims. R. Docs. 136, 137, 138, 139. Defendants replied, re-urging their stated arguments. R. Docs. 146, 147, 148, 149.

### III.    APPLICABLE LAW

#### a.  Summary Judgment Standard

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence in the light most favorable to the nonmovant. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). Initially, the movant bears the burden of presenting the basis for the motion; that is, the absence of a genuine issue as to any material fact or facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to come forward with specific facts showing there is a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c*); Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A fact is "material" if its resolution in favor of one party may affect the outcome of the case. *See Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 997 (5th Cir. 2022). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993) (citation omitted).

#### b.  Louisiana Products Liability Act

As an initial matter, the Court notes that its jurisdictional authority to decide the present

case is grounded in diversity, which requires a federal district court to apply the substantive law of the state in which it sits. *Erie v. Tompkins*, 304 U.S. 64, 71-77 (1938). Accordingly, the Court applies the Louisiana Products Liability Act to this products liability suit. The LPLA "establishes the exclusive theories of liability for manufacturers for damage caused by their products." La. Rev. Stat. Ann. 9:2800.52. Plaintiffs may not rely on Louisiana law regarding negligence, strict liability, or breach of express warranty as a viable independent theory of recovery against a manufacturer. *Jefferson v. Lead Indus. Ass'n, Inc.,* 106 F.3d 1245, 1251 (5th Cir. 1997). The elements of a products liability claim under the LPLA are: "(1) that the defendant is a manufacturer of the product; (2) that the claimant's damage was proximately caused by a characteristic of the product; (3) that this characteristic made the product 'unreasonably dangerous;' and (4) that the claimant's damage arose from a reasonably anticipated use of the product by the claimant or someone else." *Sistrunk v. Dake Corp.*, No. 13-2983, 2015 WL 4164910, *4 (E.D. La. Jul. 9, 2015); *see also Jack v. Alberto-Culver USA, Inc.*, 2006-1883, 949 So. 2d 1256, 1258 (La. 2/22/07) (citing La. Rev. Stat. Ann. 9:280054(A)).

A product is "unreasonably dangerous" under the LPLA if and only if the product meets at least one of the following criteria: (1) the product is unreasonably dangerous in construction or composition as provided in La. Rev. Stat. Ann. 9:2800.55; (2) the product is unreasonably dangerous in design as provided in La. Rev. Stat. Ann. 9:2800.56; (3) the product is unreasonably dangerous because of an inadequate warning about the product as provided in La. Rev. Stat. Ann. 9:2800.57; or (4) the product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in La. Rev. Stat. Ann. 9:2800.58. However, "[i]f a plaintiff's damages [do] not arise from a reasonably anticipated use of the product, then the 'unreasonably dangerous' question need not be reached." *Kampen v. Am.*

*Isuzu Motors, Inc.,* 157 F.3d 306, 309 (5th Cir. 1998).

## IV.    ANALYSIS

Beta USA and Apollo's motions raise various issues that this Court must address: (1) whether Gonsoulin's testing of the Beta Explorer prior to his accident qualifies as a "reasonably anticipated use" subjecting Defendants to liability under the LPLA; (2) whether Gonsoulin has a viable failure to warn claim under the LPLA; and (3) whether Gonsoulin has a viable defective design claim under the LPLA. The Court takes each in turn.

### a.  Reasonably Anticipated Use

The Court will begin its analysis by addressing Defendants' reasonably anticipated use arguments raised in their respective motions for summary judgment. R. Docs. 83, 105. The decision to take this issue first is not an arbitrary one. Indeed, "[r]easonably anticipated use" is a threshold requirement for a plaintiff's recovery under the LPLA. *Kelley v. Hanover Ins. Co.*, 98–506 (La. App. 5 Cir. 11/25/98), 722 So. 2d 1133, 1136, *writ denied*, 98-3168 (La.2/12/99), 738 So. 2d 576 ("[B]efore reaching the question whether a product is unreasonably dangerous because of an inadequate warning, a plaintiff must first meet the threshold requirement of Sec. 2800.54 A, which is that the injury arose from a 'reasonably anticipated use' of the product. It is only after such use is shown that the inquiry moves on . . . ."). Courts have thus consistently held that if a plaintiff fails to establish that his injury arose out of a "reasonably anticipated use," the manufacturer is entitled to summary judgment as a matter of law. *See e.g., Kampen*, 157 F.3d at 309 (finding plaintiff's use of a car jack while he got underneath the vehicle to inspect it was not a reasonably anticipated use); *Lockart v. Kobe Steel Ltd. Cons. Mach. Div.*, 989 F.2d 864 (5th Cir. 1993) (granting summary judgment where plaintiffs use of excavator to suspend a heavy pontoon by chaining it to the bucket's teeth was not reasonably anticipated use due to the obviousness of

the danger); *Broussard v. Procter & Gamble Co.*, 517 F.3d 767 (5th Cir. 2008) (holding plaintiff's use of a heating blanket was not reasonably anticipated because she had violated the product's express warnings). The justification for such a harsh outcome is that "if a manufacturer does not reasonably anticipate a plaintiff's use, then he owes no duty to that consumer and is not responsible for any damages caused by misuse." *Sandifer v. Hoyt Archery, Inc.*, No. 12-322, 2015 WL 5138271, at *3 (M.D. La. Aug. 31, 2015).

The LPLA expressly defines "reasonably anticipated use" as "a use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances." La. Rev. Stat. Ann. 9:2800.53(7). This language makes clear that what constitutes a "reasonably anticipated use" is an objective standard that is ascertained from the point of view of the manufacturer at the time the product left its control. *Daigle v. Audi of Am., Inc.*, 598 So. 2d 1304, 1307 (La. App. 3d Cir. 1991), *writ denied*, 604 So. 2d 1306 (La. 1992) (citing John Kennedy, *A Primer on the Louisiana Products Liability Act*, 49 LA. L. REV. 565 (1989)). It also effectively discourages the factfinder from using hindsight in determining whether a use was "reasonably foreseeable" or not. *Id.*

In *Kampen v. American Isuzu Motors, Inc.*, the Fifth Circuit directly addressed the scope of reasonably anticipated use under the LPLA and defined the term to include not only the ordinary, intended use of a product, but also some of the plaintiff's negligence as well. 157 F.3d at 316. Furthermore, the court clarified that a manufacturer is not responsible for every conceivable, foreseeable use of its product, holding that "reasonably anticipated use does not encompass misuses in direct contravention of a warning or where the danger should have been obvious to the experienced as well as the ordinary consumer."[3] *Id.* With these legal principles in

---

[3]    It is important to note the term "reasonably anticipated use" is considerably narrower in scope than its pre-LPLA counterpart, "normal use," which included "all reasonably foreseeable uses and misuses of the product."

mind, the Court proceeds to its analysis of this issue.

### i. Defining the Scope of Gonsoulin's Use of the Beta Explorer

The *Kampen* decision compels this Court to make a preliminary determination delineating the scope of Gonsoulin's conduct that comprised "use" of the Beta Explorer. *McDaniel v. Terex USA, L.L.C.*, 466 F. App'x 365, 372 (5th Cir. 2012) (explaining the "*Kampen* framework" requires the court to first define the parameters of a plaintiff's use of a product). This inquiry is imperative because whether a manufacturer could reasonably anticipate the plaintiff's conduct is oftentimes dependent upon the extent of his or her use of the product in light of the case's factual context. *See Kampen*, 157 F.3d at 309. To be sure, without a definitive summarization as to the manner in which Gonsoulin interacted with the bike leading up to the accident, it would be impossible to properly assess whether his use of the Beta Explorer was reasonably anticipated by the Defendants. *See id.*

Here, the Court observes that the parties have presented two competing theories regarding the extent of Gonsoulin's interactions with the Beta Explorer leading up to the accident. Relying on an affidavit prepared by Ms. Penton, Defendants seem to suggest that Gonsoulin's use of the Beta Explorer included deliberately operating the bike inside the Champion dealership and him somehow losing control of it. R. Doc. 83-10. Conversely, Gonsoulin's stance is that his only intention was to sit on the Beta Explorer and learn its controls, which as a salesman of the vehicle he needed to know to effectively carry out his job. R. Doc. 140-21 at 56-57. He had no desire to actually ride the bike inside the store. *Id.* Rather, he claims that it was the faulty, over-sensitive throttle that he barely touched, which ultimately caused the Beta Explorer to lurch forward and collide with the wall. *Id.*

---

*Compare Payne v. Gardner*, 56 So. 3d 229, 231 (La. 2011), *with Bloxom v. Bloxom*, 512 So. 2d 839, 841 (La. 1987) (defining "normal use"). Thus, while "normal use" could potentially encompass misuse that was clearly contrary to the manufacturer's instructions or warnings, "reasonably anticipated use" cannot include such activity—that is, actual intentional abuse of a product. *Id.*

At face value, it appears that the parties' diametrically-opposed interpretations of the use of the Beta Explorer presents a question of fact regarding the scope of his use. Indeed, Gonsoulin's credibility and the weight of the testimony inform whether he truly meant to ride the bike in the store, which are issues traditionally in the province of a factfinder and not appropriately considered on summary judgment. However, counsel for Beta USA argued at oral argument that any consideration of Gonsoulin's mindset regarding whether he intended to ride the Beta Explorer or not has no place in defining use under the LPLA and is thus immaterial to the Court's analysis here. R. Doc. 157. Instead, Defendants maintain that a more generic definition based simply on Gonsoulin's actions in interacting with the Beta Explorer—such as mounting the bike, flipping through the controls, and turning the throttle—is more appropriate. This Court agrees with Defendants' interpretation of the law.

As the Fifth Circuit has made clear in *Kampen*, defining the scope of a plaintiff's use of a particular product "does not depend in any way on his mental state." 157 F.3d at 311. Rather, the focus should only be on "what [the plaintiff] actually did and not what he intended to do." *Id.* (noting that it would be "nonsensical" to make use depend on the "user's mental state"). Applied here, the Court concludes that the proper scope of Gonsoulin's use of the Beta Explorer on the date of the accident encompasses him: (1) mounting the bike inside; (2) interacting with it to learn its controls; and (3) moving the throttle that caused the bike to lurch forward. This definition is in line with the applicable LPLA case law on this issue, which requires a plaintiff's use be delineated at "a level of generality" without regard to any subjective intent. *See id.* (citing *Delphen v. Dep't of Transp. & Dev.,* 657 So. 2d 328 (La. App. 4th Cir. 1995) and *Johnson v. Black & Decker U.S., Inc.,* 701 So. 2d 1360 (La. App. 2d Cir.1997) as examples). Any reference to whether Gonsoulin actually intended to turn the throttle is more appropriately considered with regard to whether he

violated any of the bike's express warnings and the obviousness of the danger as further discussed below. The question remains, however, whether this use defined by the Court was reasonably anticipated.

### ii. Whether Gonsoulin's Use of the Beta Explorer Is Reasonably Anticipated

Having properly defined what actions constituted Gonsoulin's use of the Beta Explorer on the date of the accident, the Court is now prepared to discuss whether there is legally sufficient evidence showing that Defendants could have reasonably anticipated his specific use of the Beta Explorer on these facts. Courts typically consider several factors in determining whether a particular use is reasonably anticipated by a manufacturer, such as: (1) whether the injured party used the product in a manner that was obviously dangerous; (2) what the user was instructed to do and warned not to do with respect to the use of the product; (3) whether the use of the product was expressly warned against in the product's labeling or manual; (4) the specific language of the product's warnings, and (5) the sophistication and experience of the user. *Sandifer*, 2015 WL 5138271, at *3 (collecting cases). Drawing upon these principles of law, Defendants argue here that Gonsoulin's handling of the Beta Explorer "inside of an enclosed building with numerous obstacles and walls," "without wearing appropriate protective equipment," and "without familiarizing himself with the controls" is contrary to the bike's express warnings and otherwise constitutes an "open and clear" danger that any user should have known. Therefore, they take the position the record indisputably supports the conclusion that Gonsoulin was not engaged in a reasonably anticipated use of the Beta Explorer when he was injured, absolving them of any liability. The Court, however, must disagree for the following reasons.

### 1. Express Warning

As an initial matter, the Court recognizes there is simply no question under the LPLA that

"reasonably anticipated use" does not include uses of a product which are in direct contravention to a manufacturer's instructions and warnings. *Kampen*, 157 F.3d at 314. The Louisiana Supreme Court's most recent pronouncement on this issue is illustrative. In *Hardisty v. Walker*, the plaintiff and his co-worker attached chains from a tractor to a bulldozer that was stuck in the mud in order to remove it. 2025-00239 (La. 6/3/25), 410 So. 3d 774. As the men attempted to tow the bulldozer, one of the chains snapped and flew backward, striking the plaintiff in the head and face. *Id.* at 776-777. Plaintiff subsequently brought claims under the LPLA against several parties, including the manufacturer of the bulldozer, Caterpillar. *Id.* On summary judgment, Caterpillar argued that plaintiff was not engaged in a reasonably anticipated use of its product because the bulldozer's manual explicitly stated: "Do not use a chain for pulling a disabled machine. A chain link can break. This action may cause personal injury." *Id.* at 777. In light of this warning language, the court upheld the trial court's granting of summary judgment, finding that there is no reasonably anticipated use where Caterpillar's manual expressly warned users, such as plaintiff, against using chains to tow a disabled machine, and there was no evidence that Caterpillar knew of any incidents or accidents involving the use of a chain to tow a disabled machine at any time before the product hit the market. *Id.* at 779-80.

Here, Defendants argue that this Court is presented with the same factual scenario. More specifically, they point out that Gonsoulin, like the *Hardisty* plaintiff, failed to follow various warnings and instructions on the bike's label and Manual, including:

- "Check the condition of the vehicle and its surroundings before starting so as to avoid accident." R. Doc. 83-4 at 5 (Beta Explorer manual).

- "For your safety, always wear helmet and protection equipment while riding." R. Doc. 83-5 (Beta Explorer label).

- "Always wear helmet and protection equipment." *Id.*

- "The rider shall receive good riding training in all functions of the vehicle with the necessary technical instruction for off-road riding, as well as wear the protective gear for off-road equipment." R. Doc. 83-4 at 3.

- The Manual provides a detailed list of the off-road equipment that should be worn when riding a dirt bike, including: "Anti-armor," "Helmet," "Goggles," "Off-road gloves," "Boots," and "Clothing." *Id.* at 5.

- "Please read instruction handbook carefully before your first ride." R. Doc. 83-5.

- "This manual explains the correct and safe use of the vehicle and a simple inspection before using. Please read the operation instructions carefully." R. Doc. 83-4 at 2.

- "The instructions in this User Manual are prepared for your own safety. Please read this User Manual carefully before operating the vehicle to ensure that you have a thorough understanding of how to operate and control." *Id.* at 3.

- "Check whether the function of the throttle is normal, and the rotation is smooth without jamming. Whether the return position is normal." Id. at 16.

- "Before departure, please familiarize yourself with all of the control components of the vehicle and how to operate them." *Id.* at 17.

- "Slowly turn the throttle (right) to start riding." *Id.*

The Court concludes, however, there is a material factual dispute in the interpretation of the Beta Explorer's warnings and instructions and how they apply to Gonsoulin as a salesman, not a potential buyer, that warrant a different outcome here than the one reached in *Hardisty*.

As this Court has already observed earlier in this order, Gonsoulin testified that when he mounted the Beta Explorer inside the Champion dealership, he never intended to ride it and that his moving of the throttle was unanticipated. R. Doc. 140-21 at 56-57. This factual assertion is crucial because there was notably no question in *Hardisty* that the plaintiff intended to "misuse" and/or "abuse" the bulldozer vis-à-vis improperly attaching chains to it. *See Hardisty*, 410 So. 3d at 774. But here, the turning of the throttle and the movement of the Beta Explorer that ultimately led to his injuries may or may not have been a deliberate choice that he made.

The Court notes that Gonsoulin's interpretation of the facts is not without support; Ms. Penton's and Gonsoulin's deposition testimony provide at least some objective evidence for his telling of the events. For instance, both stated that employees at this specific Champion dealership, including Gonsoulin, very rarely rode motorcycles like the Beta Explorer inside to test drive them or even to move them outside for display. R. Doc. 140-21 at 64; R. Doc. 140-22 at 107, 108 (explaining employees only occasionally started up engines inside and that she only ever saw Gonsoulin on a bike inside on the date of the accident). And to the extent that they did, the bikes were moved at idle speeds. R. Doc. 140-21 at 67. Furthermore, Ms. Penton specifically testified that Gonsoulin had some paralysis in right hand from a previous car accident, which the Court finds could have contributed to the reason why the throttle was unintentionally activated on the date of the accident. R. Doc. 140-22 at 93.

Thus, taking Gonsoulin's position as true as this Court is required to do on summary judgment, such evidence of a lack of intent coupled with objective facts seriously calls into question whether the Beta Explorer's warnings and instructions even applied to him. *See Coleman*, 113 F.3d at 533. Indeed, the specific ones that Defendants chose to highlight here appear to be directed at users attempting to ride the bike, rather than salesmen who are just sitting on it to learn the controls. As such, a factual determination involving the interpretation of the Beta Explorer's warnings and instructions is needed to ascertain whether Gonsoulin was really required to consider his surroundings, put on any safety gear, or read the instructions within the context of his specific use as a salesman trying to learn the controls of a vehicle that he was tasked with selling. *See id.* If it is indeed true that Gonsoulin was not planning on moving the Beta Explorer in any way, it is not beyond reason that he would take a more casual approach in using the bike in accordance with his

stated intention. [4]

Furthermore, as Gonsoulin points out in his opposition, there may be some merit to the argument that he was actually in compliance with the Beta Explorer's instructions. R. Doc. 137 at 9-10. For instance, the Beta Explorer's Manual specifically requires users to familiarize themselves with the bike before riding it,[5] which is exactly what he claims he was doing when the accident occurred. Nowhere in the manual does it warn or provide a pictogram conveying the idea that sitting on the motorcycle or gently touching the throttle indoors—particularly in a dealership context—is dangerous or prohibited. *See generally* R. Doc. 83-4. The Court thus finds that the lack of a more specific warning coupled with Gonsoulin's alleged adherence to the manual's general recommendation to familiarize presents yet another material fact question as to whether his actions were in "direct contravention" of the Beta Explorer's instructions and warnings. A jury is more appropriately equipped to construe Gonsoulin's mental impressions and how exactly they are intertwined with his actual physical use of the Beta Explorer.

## 2. Obvious Danger

In the alternative, Defendants argue that Gonsoulin's use of the Beta Explorer as an experienced motorcycle rider cannot be considered reasonably anticipated because handling the

---

[4]     While the Court is aware that the *Kampen* decision dictates that a user's subjective mindset may not be accounted for in defining use, whether Gonsoulin acted in direct contravention of the Beta Explorer's instructions and warnings is a more distinct and granular inquiry that does not necessarily prohibit such considerations. The Louisiana Supreme Court's seminal case on reasonably anticipated use supports this. *See Butz v. Lynch*, 99-1070 (La. App. 1 Cir. 6/23/00), 762 So. 2d 1214, 1218, *writ denied*, 00–2660 (La. 11/17/00). In *Butz*, the question presented on appeal was whether the plaintiff's deliberate inhalation of air brush propellant to produce an intoxicating effect while operating a motor vehicle constituted a "reasonably anticipated use" of that product by an ordinary person under the current construction of the LPLA. *Id.* at 1215. The court unequivocally held that it was not, agreeing with two Louisiana appellate courts that the "*intentional* abuse of a chemical product for the purpose of getting high is not, as a matter of law, a reasonably anticipated use of the product." *Id.* at 1218 (emphasis added). Plaintiff's state of mind and his deliberate decision to huff the propellant's contents was front and center in the court's reasoning, which provides justification for taking into account Gonsoulin's intentions at least to some extent in the present analysis. *See id.*
[5]     "Before departure, please familiarize yourself with all of the control components of the vehicle and how to operate them." R. Doc. 83-4 at 17.

bike inside, without protective gear, and without reading the instructions would have presented an obvious danger to any user. This argument invokes the specific language of the LPLA, stating that a manufacturer's duty to warn does not extend to dangers that are or should be obvious or common knowledge to the ordinary user or handler of the product. *See Ballam v. Seibels Bruce Ins. Co.,* No. 97-1444 (La. App. 4 Cir. 4/1/98), 712 So. 2d 543, 550; *Mallery v. Int's Harvester Co.,* No. 96-321 (La. App. 3 Cir. 11/6/96), 690 So. 2d 765, 768. Courts have found this rule to be even more exacting where "the user is familiar with the product, making him a 'sophisticated user.'" *Ballam,* 712 So. 2d at 550 (citation omitted). "To be relieved of the duty to warn, the manufacturer need not show that the user had actual knowledge of the danger," but rather "only that the user should have known of the danger." *Mallery,* 690 So. 2d at 768 (citations omitted). Moreover, courts have presumed that so-called "sophisticated users" know about the danger because of their familiarity with the product. *Id.* (citations omitted); *see also LaSalle v. Wilson Trailer Co., Inc.,* 2000-1731 (La. App. 3 Cir. 5/30/01), 787 So. 2d 1173, 1178-79; *Morgan v. Gaylord Container Corp.,* 30 F.3d 586, 591 (5th Cir. 1994); *Gautreaux v. Tex-Steam Co.,* 723 F. Supp. 1181, 1182-83 (E.D. La. 1989).

Applying this case law here, the Court notes preliminarily that whether Gonsoulin should have had a heightened understanding of the dangers that the Beta Explorer as a "sophisticated user" is a question of fact. The Court concedes there is no dispute that Gonsoulin has extensive experience selling, riding, and even competing on gasoline-powered motorcycles. R. Doc. 140-21 at 34-37, 46-47, 80, 106. The same cannot be said, however, of his background with electronic motorcycles, such as the Beta Explorer. For instance, Gonsoulin testified in his deposition that he has only ridden a handful of electric motorcycles. R. Doc. 140-21 at 46-47 (stating that Gonsoulin has only ever ridden three different electric motorcycles). This is important because as the

Defendants themselves note elsewhere in their briefing, there are notable differences between gasoline and electric motorcycles to such an extent that they are best considered to be separate products in certain regards. R. Doc. 96-1 at 12 (explaining electric motorcycles do not have a clutch and gears, the same auditory and tactile feedback, or the same acceleration capabilities). Accordingly, the Court is hesitant to impute Gonsoulin's extensive knowledge regarding gas-powered bikes to the facts at hand and thus refrains from declaring him a sophisticated user at this time.

Additionally, the "obviousness" of the danger posed by the Beta Explorer is inherently a factual inquiry. What might seem clearly dangerous to one person might not be so as to the next; it is not this Court's place to inject its particular perceptions as to Gonsoulin's acts into the analysis. Rather, the Court's duty is to consider the sufficiency of evidence on summary judgment, and there is more than enough for a jury to reasonably conclude that Gonsoulin's use of the Beta Explorer did not present any obvious dangers. *See Matsushita*, 475 U.S. at 586-87. At the sake of redundancy, the Court emphasizes once again that Gonsoulin says he had no intention of riding the bike and avers that merely placing his hand on the bike's loose throttle caused it to move. R. Doc. 140-21 at 56-57. Thus, it is unclear to the Court whether it can be conclusively established at this stage in the proceedings that Gonsoulin imperiled himself to the same degree that other plaintiffs who had their claims dismissed under the so-called "clear and obvious" theory did. *See, e.g.*, *Lockart*, 989 F.2d at 867-68 (use of an excavator bucket to move an object was an obvious danger and, therefore, not a reasonably anticipated use); *Spears v. Cintas Sales Corp.*, 414 F. App'x 667, 670 (5th Cir. 2011) (danger of exposing polyester uniform to flame was obvious and, thus, not a reasonably anticipated use); *In re Crosby Marine Transp., LLC*, 540 F. Supp. 3d 588, 595 (E.D. La. 2021) (replacing a navigation light by zip-tying a temporary light to a shorter pole

was an obvious danger and, therefore, not a reasonably anticipated use). As such, the question of obviousness, the Court finds, is one of material fact.

### 3. Gonsoulin's Use of the Beta Explorer as a Motorcycle Salesman

With Defendants summary judgment arguments dispensed with then, the Court is now left with the facts of this case taken in the light most favorable to Gonsoulin. *See Coleman*, 113 F.3d at 533. A motorcycle salesman who is required to sell the new Beta Explorer mounts the bike inside to learn the controls, and in putting his hand on the bike's throttle, the bike lurches forward causing him to severe injuries. Such a scenario is not so clearly beyond contemplation that this Court can conclusively say that Gonsoulin's use of the Beta Explorer surpassed what Defendants, as the manufacturer and distributer of the bike, could have reasonably anticipated in this specific factual context. Accordingly, this issue is ripe for trial and must be submitted to the jury. *See McDaniel*, 466 F. App'x at 374 (stating that the "issue of reasonably anticipated use should [be] left for our presumptively trustworthy, traditional fact-finder: the jury").

### b. Failure to Warn

Next, the Court will address whether dismissal of Gonsoulin's failure to warn claim is warranted on summary judgment. To maintain a failure-to-warn claim, a plaintiff must demonstrate that "(1) the product possessed a characteristic that may cause damage[,] and (2) the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product." La. Rev. Stat. Ann. § 9:2800.57(A). In establishing the first element, a plaintiff must provide evidence about the "cause, frequency, severity, or consequences" of the dangerous characteristic in question. *Grenier v. Med. Eng'g Corp.*, 243 F.3d 200, 205 (5th Cir. 2001); *see also Krummel v. Bombardier Corp.*, 206 F.3d 548, 552 (5th Cir. 2000) (finding that liability for failure-to-warn requires a plaintiff to provide evidence

of the probability or risk of injury from the allegedly damaging characteristic of the product). As to the second element, the LPLA defines "adequate warning" as a warning or instruction that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the damage for which the claim is made. La. Rev. Stat. Ann. § 9:2800.53(9). Further, "an essential element of the plaintiff's cause of action for failure to adequately warn of a product's danger is that there be some reasonable connection between the omission of the manufacturer and the damage which the plaintiff has suffered." *Id.* at 850.

Here, Gonsoulin submits that the Beta Explorer should have had more effective warnings to be provided in a more reasonably accessible manner. R. Doc. 18; R. Doc. 138. However, Defendants argue, *inter alia*, that such warnings would have been futile because Gonsoulin never read the Beta Explorer's instructions or warnings in the first place. R. Doc. 94. They also claim that the warnings that were provided were more than sufficient to notify users of the specific dangers that the Beta Explorer posed. *Id.* The Court will address each of these issues in turn.

### i. Causation

First, Defendants assert that Gonsoulin's failure to warn claim must be dismissed on causation grounds. More specifically, they contend that because Gonsoulin admits to not reading the Beta Explorer's warnings in the manual or on the bike's label, he cannot prove that any alleged failure to warn was the proximate cause of his injuries. Indeed, courts have routinely held that where a plaintiff entirely failed to read a product's warnings or label, there was no causation and thus dismissed their LPLA claims. *See, e.g.*, *Bloxom v. Bloxom*, 512 So. 2d 839, 850-51 (La. 1987) (finding plaintiff was unable to defeat summary judgment for a lack of a causal relationship where he did not read a car's product manual); *Peart v. Dorel Juv. Grp., Inc.*, 456 F. App'x 446, 447 (5th

Cir. 2012) (affirming summary judgment where plaintiff did not read warning on a stool and thus could not prove causation for failure to warn); *Fernandez v. Tamko Bldg. Prods., Inc.*, 456 F. App'x 446, 447 (5th Cir. 2012) (affirming dismissal of LPLA failure to warn where plaintiff did not read any warnings associated with a felt roofing product). The legal rationale behind these rulings is that "because no warning was read before using the product, the warning, inadequate as it might have been, could not have been a cause of the injury suffered by the use of the product." *Fernandez*, 456 F. App'x at 447. The Court finds on further reflection, however, that the present case is distinguishable and does not necessarily mandate the same result as those cases for two reasons.

First, unlike in *Bloxom*, *Peart*, and *Fernandez*, there is evidence that Gonsoulin actually attempted to read the Beta Explorer's label but was allegedly unable to do so due to the words' font size. R. Doc. 140-21 at 93, 185 (explaining that Gonsoulin would need a "magnifying glass" to see the label). Gonsoulin's co-worker, Ms. Penton, also claims that she had the same experience when test driving the Beta Explorer the day before the accident, testifying that she did not read the bike's label because it was "so small that really you [could not] read [the warnings] on there." R. Doc. 140-22 at 77. Even one of Gonsoulin's expert witnesses stated that he struggled with reading the warning label. R. Doc. 140-11 at 4 ("The warning labels as seen on the photographs submitted for review has lettering that is quite small and almost unreadable without concerted effort."). This evidence is key because the Beta Explorer's label notably instructs users to read the manual. R. Doc. 94-5. But if that instruction were not reasonably legible to Gonsoulin, or Ms. Penton for that matter, it is unclear whether they were adequately on notice that reading the Beta Explorer's Manual was absolutely imperative or any of the specific dangers that the bike posed. Put more simply—but for the label's alleged inadequate font size, Gonsoulin could have had a fairer

opportunity to assess the risk involved in using the Beta Explorer.

While the Court is aware that no other court tasked with interpreting the LPLA has recognized a "font size theory" similar to the one proffered by Gonsoulin here, persuasive authority provides the needed support. For instance, in *O'Neal v. Bumbo International Trust*, a federal district court in this Circuit denied summary judgment based on the fact a plaintiff had alleged they could not read a kitchen counter seat label that was printed in six-point font. 959 F. Supp. 2d 972, 978 (S.D. Tex. 2013). In doing so, the court held that:

> Such small print can make the warning inconspicuous and subject to a factual determination of inadequacy. "Numerous decisions confirm that the physical characteristics of the warning itself are pertinent to the evaluation of its adequacy. The warning's conspicuousness, prominence, and size of print, in comparison to the print size employed for other parts of the manufacturer's message, must be adequate to alert the reasonably prudent person." Madden, Owen & Davis, Madden & Owen on Products Liability § 9:10 (citation and internal quotation marks omitted); *see also* Lewis, Product Liability: Design and Manufacturing Defects § 4:9 (noting that warnings should be "eye arresting" and "may be inadequate because they are not conspicuous enough"). Plaintiffs list other potential inadequacies identified by their expert, regarding such things as the fadeability of the print, the contrast between the color of the print and the seat, the all-capital lettering, and the order in which the warnings are given. While some of these theories seem more plausible than others, a fact question remains for the jury to resolve about the adequacy of the on-seat warning. Accordingly, summary judgment is not appropriate.

*Id.* at 979-80. The Court agrees with this reasoning and finds it pertinent not only to the adequacy inquiry but also causation—especially where a failure to read is accompanied by a potentially egregious choice in the form in which a manufacturer conveys its warnings.[6]

---

[6]    Although the court in *O'Neil* was applying Indiana products liability law, the Court could find no meaningful distinction between that law and the LPLA, such that it would not be informative whatsoever in this context. *Compare* Ind. Code Ann. § 34-20-2-2 ("[T]he party making the claim must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product or in providing the warnings or instructions) *with* La. Rev. Stat. Ann. § 9:2800.57(A) (A plaintiff must prove that "a manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.").

Second, the Court notes that whether the Beta Explorer's manual was reasonably made available to Gonsoulin for his review as a motorcycle salesman, and not a buyer, is seriously in question. As noted in Ms. Penton's deposition, the bike's manual was "stored in a nice, pretty box" because she "did not want to ruin [it] for a customer who was going to buy it." R. Doc. 140-22 at 78. With this in mind, there is no indication on the record that Defendants provided a separate manual for dealership salespersons to review before sitting on or even test driving the Beta Explorer—not only so that they can understand the product that they are trying to sell, but also to warn them in demonstrating its capabilities to customers as required by their position. Indeed, as Ms. Penton's deposition testimony indicates, customers were not permitted to ride the motorcycles at this Champion dealership. R. Doc. 140-22 at 54, 69. Instead, employees like her and Gonsoulin were made to test drive the bikes, like the Beta Explorer, in order for the customers to assess how they ride. *Id.* at 103, 133-34 (explaining Ms. Penton was required to drive a Beta Explorer for a customer after the accident occurred).

As such, the Court finds that there is a genuine issue of material fact if Gonsoulin's failure to read the Beta Explorer's warnings and instructions was the result of user inattention and assumption of risk or Defendants' failure to communicate the warnings in a reasonably accessible manner to Gonsoulin. Whether Defendants could have made the Beta Explorer's label font size larger or provided Gonsoulin a copy of the manual as a person tasked with selling their bike are jury questions that present viable causation theories for Gonsoulin's failure to warn claim. More specifically, these theories explain that it could be due to Defendants' chosen methods in warning Gonsoulin that he did not read the Beta Explorer's instructions, which ultimately made him more vulnerable to having an accident exactly like the one that occurred here. Accordingly, the Court rejects Defendants' causation argument.

21

## ii.  Adequacy of the Warnings

Next, Defendants argue that Beta USA provided a plethora of specific warnings to Gonsoulin regarding the safe operation of the Beta Explorer in the Manual and on the Beta Explorer itself, such that their adequacy cannot be in question. In determining whether a warning is adequate, courts balance various considerations, including: (1) the severity of the danger, (2) the likelihood that the warning will catch the attention of those who will foreseeably use the product and convey the nature of the danger to them, (3) the intensity and form of the warning, and (4) the cost of improving the strength or mode of the warning." *Bloxom*, 512 So. 2d at 844. Whether a particular warning is adequate is usually a question for the trier of fact. *Jack*, 949 So. 2d at 1259; *see also Walker v. Manitowoc Co.*, 2016-897, 259 So. 3d 465, 477 (La. App. 3d Cir. 10/10/18). However, when the warnings provided by the manufacturer are specific to the circumstances of a claim, the adequacy of the warning oftentimes does not present an issue of fact, and an award of summary judgment is appropriate. *See, e.g.*, *Broussard v. Procter & Gamble Co.*, 463 F. Supp. 2d 596, 608-10 (W.D. La. 2006), *affirmed*, 517 F.3d 767 (5th Cir. 2008).

Here, as the Court noted above with respect to the reasonably anticipated use issue, there is a fact question as to the application and specificity of the Beta Explorer's warnings in relation to a motorcycles salesman who is simply sitting on the bike to learn its controls. *See supra*, at 10-14. Therefore, this is not a situation where the warnings provided by the manufacturer are so clear and specific that summary judgment is appropriate. Moreover, the Court has also already highlighted that there are fact questions as to the adequacy of the Beta Explorer's label based on Defendants' chosen font size and failure to provide a "salesperson specific manual." *Id.* at 18-21. Finally, the Court observes that Gonsoulin has testimony from two experts disputing the sufficiency of the Beta Explorer's warnings for failing to indicate that it lacked certain safety

features common to all motorcycles and being too small to read. R. Doc. 140-17 at 1-2 (highlighting the lack of warnings about features of the Beta Explorer that could "catch even experienced motorcycle riders off guard"); R. Doc. 140-11 at 4 ("The warning labels as seen on the photographs submitted for review has lettering that is quite small and almost unreadable without concerted effort."). Accordingly, there are genuine issues of material fact as to the adequacy of the Beta Explorer's warnings to Gonsoulin that must go before a jury.[7]

### c. Design Defect

Lastly, the Court will address Defendants' argument that summary judgment is warranted on Gonsoulin's design defect claim. Under the LPLA, a product is unreasonably dangerous in design if, at the time the product left its manufacturer's control: (1) there existed an alternative design for the product that was capable of preventing the claimant's damage; and (2) the likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. La. Rev. Stat. Ann. § 9:2800.56. Notably, "Louisiana law does not allow a fact finder to presume an unreasonably dangerous design solely from the fact that injury occurred." *Celino v. Biotronik, Inc.*, No. 20-2298, 2021 WL 2982971, at *2 (E.D. La. July 15, 2021). In all but the most basic cases, expert evidence is required to support an allegation that a product is defective in design. *McCarthy v. Danek Med., Inc.*, 65 F. Supp. 2d 410, 412 (E.D. La. 1999) ("Without expert or technical evidence to support

---

[7]        As for Defendants' argument regarding the lack of expert testimony, the Court notes that it does not plan to categorically exclude Gonsoulin's experts as will be explained in a forthcoming order and thus will not dismiss his failure to warn claim on this ground. Even so, the Court finds that Gonsoulin's specific challenges to the Beta Explorer's warnings are not so complex as to require expert testimony in understanding how they are deficient. Issues as to whether a warning's font is too small or whether the product lacks common safety features are rather straightforward. Moreover, the Court has also already found that questions related to Gonsoulin's experience with electric motorcycles under the sophisticated user doctrine and the obviousness of danger that the Beta Explorer posed are pregnant with facts. Accordingly, the Court rejects these arguments raised by Defendants with respect to Gonsoulin's failure to warn claim as well.

the contention that the design was defective or to establish an alternative design, plaintiff has failed to create an issue of fact to be left to a jury"); *Broussard v. Procter & Gamble Co.*, 463 F. Supp. 2d 596, 611 (W.D. La. 2006) ("An unreasonably dangerous design will not be presumed simply because injury occurred; rather, the plaintiff must come forward with scientifically viable evidence to show that the alternative design would have prevented her injuries").

Here, Gonsoulin contends that the Beta Explorer was defective in design because the bike:(1) lacked a kill switch, (2) did not have a rear brake pedal, and (3) had an overly-sensitive throttle.[8] On summary judgment, however, Defendants argue that Gonsoulin has merely set forth unspecific safety designs and has provided no expert testimony that the proposed changes would have prevented his injuries. They also argue that Gonsoulin's experts did not consider certain aspects of the risk-utility analysis required for a design defect claim. The Court takes each issue in turn.

### i.  The Existence of Alternative Designs

At first instance, the Court rejects Defendants' position that Gonsoulin has failed to identify specific, non-speculative alternative designs in support of his design defect claim. Gonsoulin's experts, both in their depositions and reports, have opined extensively on Defendants' failure to incorporate a rear brake pedal and a kill switch on the Beta Explorer whereas other electric

---

[8]     To the extent Gonsoulin has also alleged a design defect based on characteristics inherent to gasoline-powered motorcycles and not electric ones, the Court agrees that such proposed safety features cannot support his claim. While a gasoline motorcycle and an electric motorcycle are both designed to accomplish the same general function, i.e. transportation of a rider from one location to another, the reality is that they are two different products in many ways. Gonsoulin has provided no evidence to refute this. Therefore, the Court finds that whether or not the Beta Explorer had a clutch and gears, greater noise/vibration, and slower end acceleration are not appropriate issues for trial and may not be argued to the jury. *See, e.g., Theriot v. Danek Med., Inc.*, 168 F.3d 253 (5th Cir. 1999) (holding that a claimant cannot satisfy the existence of an alternative design by demonstrating entirely different products existed); *see also Massa v. Genentech*, Inc., No. 11-70, 2012 WL 956192 (S.D. Tex. Mar. 19, 2022) ("A plaintiff cannot demonstrate the existence of a safer alternative design by pointing to a substantially different product, even when the other product has the same general purpose as the allegedly defective product. A safer alternative design must be one for the product at issue, not a different product."). The remaining safety features that the Court will discuss, however, seem to be more universal and thus applicable to both electric and gasoline-powered motorcycles alike.

motorcycles, including some manufactured by Defendants,[9] have these safety features. R. Docs. 140-11 at 4 (identifying three other electric motorcycles with kill switches and rear brake pedals); 140-14 at 5 (noting the lack of a kill switch and rear brake pedals); R. Doc. 140-17 at 2 (explaining the Beta Explorer does not have a kill switch or rear brake pedals); *see also* R. Doc. 139-14 (list of electric motorcycles identified with kill switches). Gonsoulin himself even stated in his deposition that all three of the electric motorcycles that he had ridden prior to the Beta Explorer included both a kill switch and a rear brake pedal. R. Doc. 140-21 at 46. And as for Gonsoulin's proposed throttle design, his expert Mr. James Evans conducted an extensive analysis mapping out the throttle force and resistance in two other motorcycles, one gasoline-powered and another electric, compared to the Beta Explorer and found that its "throttle was much easier to apply, taking less than half the force of other dirt bikes or motorcycles." R. Doc. 89-8 at 13. In doing so, he necessarily identified at least two other specific designs that required more weight and angling to engage the motorcycle's throttle. *Id.* at 8.

It is unclear to the Court why Gonsoulin should then be required to show here whether his proffered changes to the Beta Explorer's design can be feasibly incorporated into the bike with extensive drawings and data when other similarly-situated bikes with these exact same features already exist on the market. To be sure, at least one federal district court in interpreting the LPLA's design defect provision has recognized that the Fifth Circuit jurisprudence has no "bright line requirement that proffered alternative designs must be built and tested" where an expert's proposed alternative design "has already been commercially produced by [a manufacturer]." *Sandifer*, 2015 WL 5138271, at *8; *Johnson v. Transwood, Inc.*, No. CV 14-102, 2016 WL 589875, at *5 (M.D. La. Feb. 11, 2016) ("[T]he plaintiff's burden is not to show that an alternative design was

---

[9]    R. Doc. 139-7 at 3 (noting the Beta Kinder and Apollo electric motorcycles have a kill switch).

'feasible,' but instead simply to show that the alternative design was 'in existence' at the time the product left the manufacturer's control."). Such specific expert testimony is required more so where a plaintiff's alternative design is entirely new and untested or involves complex calculations and incorporation into the product at issue. *See, e.g.*, *Seither v. Winnebago Indus., Inc.*, 2002-2091 (La. App. 4 Cir. 7/2/03), 853 So. 2d 37, 41 (finding that an expert's proposal of using a van design instead when constructing the front end of an RV was "untested" and "unengineered"); *Vallee v. Crown Equip. Corp.*, No. 22-30053, 2023 WL 2964407, at *1-2 (5th Cir. 2023) (noting that a proposed safety door for a forklift would require information as to extremely specific door dimensions, composition, and attachment methods). As explained above, that is simply not the case here where both the incorporation of a kill switch and rear brake pedal appear to be rather straightforward mechanical designs,[10] and an expert has identified more resistant throttles in other bikes through seemingly rigorous scientific testing.

### ii. Whether The Proposed Safety Features Would Have Prevented or Reduced Gonsoulin's Injuries

Defendants' argument that Gonsoulin failed to demonstrate that his proposed alternative designs would have been capable of preventing his injuries fairs no better. Contrary to their assertion, Gonsoulin "need not demonstrate that his proposed alternative design would completely prevent damages of the sort he suffered." *White v. Black & Decker (U.S.) Inc.*, No. 03-0874, 2004 WL 1373271, at *7 (E.D. La. June 16, 2004). "Rather, he needed only show that his proposed alternative design would have been significantly less likely to cause the damages." *Id.* (citing *Johnson v. Black & Decker U.S., Inc.,* 701 So. 2d 1360, 1367 (La. App. 2 Cir. 1997), *writ denied,* 709 So.2d 741 (La. 1998)); *see also Bernard v. Ferrellgas, Inc.,* 689 So. 2d 554, 560 (La.

---

[10]     For example, there is evidence showing that the owner of the Champion dealership where Gonsoulin worked was able to easily install a kill switch on the Beta Explorer himself after the accident and without any heightened motorcycle design expertise. R. Doc. 140-21 at 150.

App. 3 Cir. 1997) (noting "the question is whether the alternative design would have *reduced* the plaintiff's injuries"). With this in mind, the Court explains below that there is a question of material fact as to whether the incorporation of a kill switch, right rear brake pedal, and a throttle with more resistance would have had some positive impact in the context of Gonsoulin's accident for the following reasons. *See White*, 2004 WL 1373271, at *7.

### 1. Kill Switch[11]

Initially, the Court recognizes that both Gonsoulin and Defendants' experts seem to agree that the activation of a kill switch would not have necessarily stopped the Beta Explorer within the 25 feet it took for Gonsoulin to collide with the wall. R. Doc. 147 at 7-8. Gonsoulin's expert Mr. Evans has opined separately in an affidavit, however, that if the Beta Explorer had a kill switch, Gonsoulin could have instantly hit it with his thumb, which would have returned his front wheel to the ground, reduced the speed of the motorcycle, and thus lessened his impact. R. Doc. 139-7 at 3. Furthermore, Gonsoulin plans to call his treating physicians as experts who may be able to testify at trial as to the extent of his injuries in relation to the speed that he was going when the accident occurred and whether they would have been less substantial had he been going more slowly at the time of impact. R. Doc. 156. As such, there is sufficient evidence on the record for a

---

[11]    In support of his design defect claim, Gonsoulin has argued that the Federal Motor Vehicle Safety Standards ("FMVSS") require the Beta Explorer to be equipped with a kill switch. These regulations, however, only apply to "vehicles . . . manufactured *primarily for use on public streets, roads, and highways*." 49 U.S.C. § 30102(a)(7) (emphasis added). Because there is no dispute that the Beta Explorer was designed and advertised as an off-road motorcycle, the Court finds the FMVSS to be inapplicable here. R. Doc. 140-33 (Defendants' motorcycle design expert explaining that the FMVSS does not apply to the Beta Explorer and identifying at least 10 other "off-road electric motorcycles" that do not have a kill switch). While the Court notes that the existence of the FMVSS kill switch requirement may be relevant insofar as regulators have made this safety feature compulsory in certain contexts, its probative value does not exceed the prejudicial effect it would have on jurors who would likely be confused on how to consider this specific regulation when it categorically does not apply to the Beta Explorer. *See* Fed. R. Evid. 403. Accordingly, the Court will prohibit Gonsoulin from referencing the FMVSS and its kill switch requirement at trial based on its inapplicability to the Beta Explorer and prejudicial nature.

Additionally, the Court will prohibit Gonsoulin from referencing at trial the European standards for motorcycles contained in the Conformité Européenne (the "CE") on the same basis. The issues in this case, indisputably, involve a motorcycle marketed, distributed, and sold in the United States.

jury to reasonably conclude that the use of kill switch—had there been one—would have slowed the Beta Explorer's speed to some extent and thereby potentially reduced the extremity of his injuries. See *Bernard,* 689 So. 2d at 560 (noting only proof of reduction of injuries is necessary to prove a design defect claim).

### 2.  Rear Brake Pedal

Mr. Evans has also provided expert testimony explaining that the incorporation of a rear brake pedal is crucial in a motorcycle's design because "in the event of a wheelie or unintended front-end lift, the rider can quickly press the rear brake with their right foot while maintaining a firm grip on the handlebars to remain steady." R. Doc. 139-7 at 3. The specific facts of this case perfectly illustrate this concept given that Gonsoulin has claimed he was unable to reach the front brakes on the handlebars when the Beta Explorer wheelied. R. Doc. 140-21 at 58. In light of Mr. Evans's expert testimony then, a reasonable jury could conclude that Gonsoulin arguably would have had a better chance at stopping the bike if a rear brake pedal would have been incorporated into the Beta Explorer's design. Indeed, it is the Court's understanding from oral argument that the application of a rear brake serves to halt all movement of the back wheel almost immediately. R. Doc. 157.

### 3.  Throttle

Lastly, as noted above, Mr. Evans tested both the average force and angling needed to twist the Beta Explorer in comparison to other motorcycles and concluded that "[t]he light force required to rotate the Beta's throttle, along with the relatively small throttle rotation angle, means that [Gonsoulin] could have accidentally applied full throttle when holding the handlebars." R. Doc. 140-14 at 11. This expert opinion is in line with Gonsoulin's claim that it only took a slight, unintentional movement of the Beta Explorer's throttle to cause the bike to move forward. Based

on this evidence, the Court finds that a reasonable jury could conclude that an accident like this would have been less likely to occur—if at all—had the Beta Explorer's throttle been designed with more resistance and required a heightened angling of the hand to move it similar to the other two bikes tested.

### iii.  Danger v. Utility Analysis

Finally, Defendants assert that Gonsoulin failed to perform the risk-utility analysis required for a design defect claim under the LPLA. La. Rev. Stat. Ann. 9:2800.56(2) requires a plaintiff to show that "[t]he likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product." The statute then goes on to specifically state that "[a]n adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product." *Id.*

Based on this language, Defendants argue that Gonsoulin's experts failed to consider the Beta Explorer's warnings as part of their analysis when offering opinions that modifications to the design of the bike were needed. However, the Court notes that two of Gonsoulin's experts, Edward Patterson and Robin Simmons, have directly addressed the Beta Explorer's warnings—both as to their substance and the form in which they were presented to Gonsoulin. R. Doc. 140-11; 140-17. Thus, it cannot be said that Gonsoulin has provided no evidence on this issue, such that his risk-utility analysis is entirely insufficient. Accordingly, the Court rejects this argument and will allow Gonsoulin's design defect claim to be submitted to the jury.[12]

---

[12]    Again, the Court notes that it has already clarified that it will not categorically exclude Gonsoulin's experts and found there are genuine issues of material fact related to Gonsoulin's experience with electric motorcycles under the sophisticated user doctrine and the obviousness of danger that the Beta Explorer presents. Accordingly, the Court also rejects these arguments made by Defendants regarding Gonsoulin's design defect claim.

## V.    CONCLUSION

For the foregoing reasons;

**IT IS HEREBY ORDERED** that Defendants' Motions for Summary Judgment, R. Docs.

83, 94, 96, and 105, are **DENIED**.

New Orleans, Louisiana, this 31st day of July, 2025.

_____

United States District Judge